# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

## DURHAM DIVISION

| | |
|---|---|
| SMART ONLINE, INC., ) <br><br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> SHERB & CO., LLP, RUBEN SERRANO, ) <br> ALAIN LUSTIG, ANTHONY MARTIN, ) <br> JAMES DOOLAN, and JESUP & ) <br> LAMONT SECURITIES CORP. ) <br> ) <br> Defendants. ) <br> ) <br> ) | **Civ. No. 1:10-cv-244** <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, Smart Online, Inc., by counsel authorized to act on its behalf, alleges, upon information and belief, said information and belief being based upon the investigation conducted by and through counsel, including the review of various federal governmental criminal filings, including federal government complaints, indictments and informations, the records of actions resulting in post-trial criminal convictions and criminal plea agreements and elocutions, as follows:

## OVERVIEW OF THIS ACTION

1.      As described herein, the Broker Defendants (as defined below), in association with Smart Online Directors/Officers (as defined below), conducted an

enterprise through a pattern of racketeering activity, *inter alia*, accepting bribes and other illegal consideration to solicit investors to purchase SOI securities, transporting stolen good across state lines, and fraudulently using the wires. This enterprise involved Directors/Officers of Smart Online bribing broker/dealers, thereby committing securities fraud. The bribed brokers solicited purchases of more than 267,000 shares of SOI stock from investors, which accounted for approximately 10% of the trading volume from May 2005 to January 2006.

2. SOI began trading on the National Association of Securities Dealers' Over-the-Counter Bulletin Board ("OTC BB") on April 15, 2005, with an opening stock price of $1.50 per share. In the ensuing months, Broker Defendants conducted the enterprise to increase stock trading volume and the overall number of shareholders in order to qualify for a listing on the NASDAQ Capital Market ("NASDAQ"). A NASDAQ listing would increase the Company's visibility, reputation, and ability to raise equity financing, resulting in financial gain for the associates participating in the RICO enterprise.

3. On January 17, 2006, however, the day that the Company was scheduled to begin trading on NASDAQ, the SEC issued an Order of Suspending of Trading, stating, possible manipulative conduct occurred in the market for the company's stock. The SEC suspended trading from January 17, 2006 through January, 30 2006.

4. On September 11, 2007, after an extensive investigation, the SEC filed an injunctive complaint in the United States District Court for the Southern District of New York, Docket No. 07-7960 (PKC) (the "SEC Complaint"), naming the following as defendants: Smart Online, Dennis Michael Nouri, Reeza Eric Nouri, Anthony Martin,

2

James Doolan, Ruben Serrano, and Alain Lustig. That same day, Dennis Michael Nouri, Reeza Eric Nouri, Ruben Serrano, Anthony Martin, James Doolan, and Alain Lustig were arrested and charged by the United States in the Southern District of New York with federal securities fraud and conspiracy to commit securities fraud.

5. On November 8, 2007, the United States filed grand jury criminal Indictments (the "Indictments") in the Southern District of New York against Dennis Michael Nouri (Docket No. 1:07-cr-01029-DC-1), Reeza Eric Nouri (Docket No. 1:07-cr-01029-DC-2), Ruben Serrano (Docket No. 1:07-cr-01029-DC-3), and Alain Lustig (Docket No. 1:07-cr-01029-DC-4). On December 20, 2007, defendant Anthony Martin waived Indictment and the United States instead filed an Information that same day. *See* Docket No. 1:07-cr-01226-DC-1 (Southern District of New York). On February 11, 2008, defendant James Doolan waived Indictment and the United States filed an Information ("Doolan Information"), to which he then pled guilty that same day. *See* Docket No. 1:08-cr-00113-SHS-1 (Southern District of New York). Collectively, the Indictments and Information(s) will be referred hereinafter as "Federal Criminal Action Charging Papers." All individuals who were indicted either pled guilty or were found guilty of securities fraud and other federal crimes.

6. Hereinafter, the SEC action (the "SEC Civil Action"), and the numerous criminal cases brought by the United States Attorney brought in connection with the manipulation of SOI securities will be referred to collectively as the "Government Actions." Plaintiff incorporates by reference the dockets in the Government Actions herein.

7.    By virtue of defendants' racketeering activity, unfair trade practices, malpractice, and breach of contract, Smart Online suffered harm to its reputation with both investors and vendors, had a decreased ability to raise capital, and incurred costs associated with the securities fraud litigation.

## JURISDICTION AND VENUE

8.    The Court has jurisdiction over the RICO claim pursuant to the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) (civil remedies for RICO violations). This Court has supplemental and diversity jurisdiction over claims asserted herein that arise under and pursuant to North Carolina state law, including the North Carolina Unfair Trade Practices Act § 75-1.1, North Carolina common law, and contract.

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. 1964(c). This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

10.    Each defendant named herein has sufficient minimum contacts with this District, state, or the United States so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## PARTIES

12.    Plaintiff **SMART ONLINE, INC.** (hereinafter "SOI", "Smart Online", or "Company") is a corporation organized and existing under and by virtue of the laws of

4

the State of Delaware. Smart Online is a leading provider of software applications and tools for small businesses. SOI develops and markets internet-delivered software-as-service applications and data resources aimed primarily at small businesses. At all relevant times, SOI's principal offices were located at 2530 Meridian Parkway, 2nd Floor, Durham, North Carolina 27713.

13. SOI provides a private-label syndicated online business platform that enables on-demand web delivery of applications and services to small businesses with fewer than 50 employees. Smart Online pioneered the market for small business software applications and its products automate and streamline business processes, reduce operating costs, and improve internal controls. The Company targets financial services, retail, media, and telecommunication industries in its sales and marketing efforts.

**AUDITOR DEFENDANT**

14. Defendant **SHERB & CO., LLP** ("Sherb") served as Smart Online's outside auditor from April 3, 2006 through at least September 2007. Sherb audited the Company's financial statements and issued an unqualified opinion, despite the fact that Sherb knew or was reckless in not knowing material information related to the conduct of the other defendants named herein and the government investigations leading to the Government Actions.

**BROKER DEFENDANTS**

15. Defendant **RUBEN SERRANO** ("Serrano"), a resident of Jersey City, New Jersey, worked as a broker for Maxim. Upon information and belief, based on the Criminal Action Charging Papers, defendant Serrano participated in the conduct of the

RICO enterprise to effectuate a securities fraud and a wire fraud. On May 19, 2009, defendant Serrano pled guilty to securities fraud charges.

16. Defendant **ANTHONY MARTIN** ("Martin"), a resident of Jersey City, New Jersey, worked as a broker for Maxim between October 2002 and June 2006. Upon information and belief, based on the Criminal Action Charging Papers, defendant Martin participated in the conduct of the RICO enterprise to effectuate a securities fraud and a wire fraud. After a jury trial in the District Court for the Southern District of New York, defendant Martin was convicted securities fraud, conspiracy to commit securities fraud, wire fraud, and commercial fraud.

17. Defendant **JAMES DOOLAN** ("Doolan"), a resident of Bayville, New York, worked as a broker for Maxim between October 2002 and July 2006. Upon information and belief, based on the Criminal Action Charging Papers, both in the Southern District of New York, defendant Martin participated in the conduct of the RICO enterprise to effectuate a securities fraud and a wire fraud. On February 11, 2008, defendant Doolan pled guilty to the Information filed against him, and he entered into a partial consent judgment in the SEC Civil Action.

18. Defendant **JESSUP & LAMONT SECURITIES CORP.** ("JLSC") is a registered broker-dealer and investment banking firm, with its principal offices located at 650 Fifth Avenue, 3rd Floor, New York, New York 10019. JSLC was listed by the OTC BB as a market maker. JLSC employed defendant Lustig, and benefited from the misconduct alleged herein by charging fees and sales charges to unsuspecting customers. Defendant JLSC provided facilities for accomplishing the manipulation of SOI shares

and JLSC knew or recklessly disregarded the manipulative and deceptive conduct of defendant Lustig. Defendant JLSC is liable for its employees' conduct under the doctrine of *respondeat superior*.

19. Defendant **ALAN LUSTIG** ("Lustig"), a resident of Massapequa, New York, worked as a broker for JLSC. Upon information and belief, based on the Criminal Action Charging Papers, defendant Lustig was an actual participant in part and parcel of the manipulative and unlawful scheme complained of herein. On May 22, 2009, defendant Lustig pled guilty to securities fraud charges.

20. Defendants Martin, Doolan, Serrano, Lustig and JLSC are referred to collectively herein as the "Broker Defendants." The Broker-Defendants and Sherb are collectively referred to herein as "Defendants").

## NON-DEFENDANT RICO ASSOCIATES AND CO-CONSPIRATORS

21. The following are former directors and/or officers of Plaintiff, SOI. All acted beyond the scope of their employment with Plaintiff by engaging in activity that made them associates of the RICO enterprise (hereinafter "associates").

22. **DENNIS MICHAEL NOURI** ("Michael Nouri") served as President, Chief Executive Officer, Chairman of the Board, and Director of SOI, which he co-founded with his brother, Henry Nouri, in 1993. Michael Nouri stepped down as Chairman of the Board of Directors of SOI on July 7, 2006.

23. **HENRI NOURI** (a/k/a **HENRY NOURI**) (hereafter, "Henri Nouri") co-founded Smart Online in 1993 with his brother, Michael Nouri. Henri Nouri served as

the former Executive Vice President (Research and Development) of SOI and served as a Director.

24. **REEZA ERIC NOURI** ("Eric Nouri") is the brother of defendants Michael and Henri Nouri and a former employee of SOI who worked as an office manager. Defendants Michael Nouri, Henri Nouri and Eric Nouri are collectively referred to herein as the "Director/Officers").

## THE RICO ENTERPRISE

25. In order to generate artificial demand for Smart Online stock, certain Directors/Officers paid secret bribes, kickbacks, and illegal payments to the Broker Defendants to induce them to sell Smart Online promote and stock to their respective customers.

26. In order to increase the number of Smart Online shareholders and to generate artificial demand for Smart Online stock, Directors/Officers of Smart Online, made agreements to pay for each share of Smart Online stock Broker Defendants sold. *See* SEC Complaint at ¶ 21. To conceal the bribes, Director/Officers entered into fictitious agreements with one or more of the Broker Defendants. *Id.* at ¶ 23. From May 2005 through January 2006, the Broker Defendants solicited purchases of at least 267,000 SOI shares from unsuspecting investors, generating massive fees from which the Broker Defendants benefited. *Id* at ¶¶ 3, 25.

27. To further the RICO enterprise, Broker Defendants undertook numerous acts to conduct the RICO enterprise, as noted in the complaint and Indictments filed in the Government Actions, including:

8

(a)     In July 2005, Director/Officer of Smart Online entered into a separate bribery scheme with Serrano. *Id.* at ¶ 34. They also entered into a sham consulting agreement to conceal the bribes. *Id.* Defendant Serrano purchased 1,002 shares of Smart Online stock on August 19, 2005, and he accepted cash compensation for that and other previous purchases of SOI stock for defendant Serrano's clients. Indictments at ¶¶ 17(a) and 17(b). Between July 2005 and December 2005, Directors/Officers of Smart Online paid defendant Serrano approximately $21,000 for soliciting purchases of Smart Online stock from Serrano's customers during that time period. SEC Complaint at ¶ 36.

(b)     Two days later, defendant Lustig accepted $1,000, in exchange for defendant Lustig's purchase of Smart Online stock for his clients. Indictments at ¶¶ 17(d) and 17(e).

(c)     On January 13, 2006, defendant Doolan was paid approximately $1,000 in exchange for purchasing shares of Smart Online for his brokerage customers. Doolan Information at ¶ 9(a).

(d)     Defendant Lustig spoke on the telephone with a member of the RICO enterprise on February 5, 2007 and April 20, 2007. *Id.* at ¶¶ 17(i) and 17(k).

(f)     Between May 2005 and January 13, 2006, the RICO enterprise controlled the trading in Smart Online stock. For example, Broker Defendants purchased a specific number of Smart Online shares at a specific price, in an attempt to raise the price of Smart Online stock. SEC Complaint at ¶ 40.

9

Associates of the RICO enterprise, including Broker Defendants, often purchased odd lots (*i.e.*, 101 shares, 201 shares, etc.), to allow the RICO enterprise to track more easily the trades as reported by trading services. *Id.*

## ARRESTS AND CONVICTIONS FOR SECURITIES FRAUD

28.    On September 11, 2007, after obtaining investigative assistance from the Federal Bureau of Investigation, the SEC filed an injunctive complaint in the Southern District of New York.  The SEC Civil Action named the following as defendants: Smart Online, Michael Nouri, Eric Nouri, Martin, Doolan, Serrano, and Lustig.   Each was charged with violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and SEC Rule 10b-5 in connection with the payments of bribes to Martin, Doolan, Serrano, and Lustig, among others.

29.    News of the arrests sent shock waves through the investing community, as evidenced by the seismic drop of SOI's per share price in a single trading day.  Smart Online stock opened at $2.55 that morning and closed to a paltry $.68, on heavy trading volume of 139,000 shares.

30.    On November 8, 2007, the United States Attorney for the Southern District of New York filed grand jury criminal Indictments against defendants Michael Nouri, Eric Nouri, Serrano, and Lustig, and an Information against defendants Martin and Doolan.  The Federal Criminal Action Charging Papers leveled charges against each of the foregoing defendants for conspiracy to commit securities fraud, securities fraud, wire fraud, and commercial bribery.  The Indictments charged and the defendants later pled guilty to the following:

Pay[ing] secret bribes, or 'kickbacks,' to [a confidential witness who was a registered representative of the Manhattan branch of a brokerage firm], and others known and unknown, in order to induce SERRANO, LUSTIG, [two co-conspirators], and others known and unknown, to sell Smart Online stock to their customers. . . .

SERRANO, LUSTIG, [two co-conspirators], and others known and unknown, did not disclose to their customers, notwithstanding their respective fiduciary duties to do so, the facts that: [] they had been induced to recommend Smart Online stock by means of secret bribes [and] they had in fact received such bribes. In addition, the statements that SERRANO, LUSTIG, [co-conspirators], and others made to their customers about Smart Online were materially misleading in light of the omitted information described above.

31. The Information with which defendant Doolan was charged and later pled guilty was as follows:

From in or about May 2005 through in or about July 2007, JAMES DOOLAN, the defendant, and others known and unknown, participated in a fraudulent scheme to manipulate artificially the market price and demand for Smart Online stock and to defraud the purchasers of Smart Online stock. In order to generate an artificial demand for Smart Online stock, DOOLAN, and others known and unknown, were paid secret bribes, or "kickbacks," by the former Chief Executive Officer of Smart Online, and others known and unknown, in order to induce DOOLAN and others to sell Smart Online stock to their brokerage customers.

\*     \*     \*

In soliciting purchases of Smart Online stock, JAMES DOOLAN, the defendant, and others known and unknown, did not disclose to their customers, notwithstanding their respective fiduciary duties to do so, the fact that: (1) they had been induced to recommend Smart Online stock by means of secret bribes; or (2) they had in fact received such bribes. In addition, the statements that DOOLAN and others made to their customers about Smart Online were materially misleading in light of the omitted information described above.

32. On the day of the filing of the Indictments, a press release issued by the United States Attorney described part of the conspiratorial scheme:

In several recorded conversations and telephone calls, DENNIS MICHAEL NOURI and REEZA ERIC NOURI discussed the details of the fraudulent scheme, including the amount of the kickbacks paid to brokers for buying Smart Online stock and the NOURIS' desire to pump up the price of the stock before the company was listed on the NASDAQ Capital Market.

In conversations recorded after the Securities and Exchange Commission ("SEC") suspended trading of Smart Online stock on the NASDAQ, DENNIS MICHAEL NOURI described how to lie to investigators to cover up the scheme and how to be careful when paying kickbacks to brokers. He warned that someone might be taking pictures and demonstrated how to transfer money to another person without being seen. In another meeting, NOURI took a cooperating broker's cell phone to delete a phone number the broker had been using to contact him, and gave the broker a number to call when speaking with him in the future.

## ALLEGATIONS AGAINST AUDITOR DEFENDANT SHERB

33. In the 2006 10-K, defendant Sherb included a "Report of Independent Registered Public Accounting Firm," dated March 28, 2007, as follows:

We have audited the accompanying consolidated balance sheets of Smart Online, Inc. as of December 31, 2006 and 2005, and the related consolidated statement of operations, stockholders' (deficit) equity, cash flows for each of the years then ended December 31, 2006, 2005 and 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Smart Online, Inc. as of December 31, 2006 and 2005, and the results of its operations and its cash flows for each of the years then ended December 31, 2006, 2005 and 2004, in conformity with accounting principles generally accepted in the United States.* [Emphasis added].

Unlike prior auditors engaged by the Company, who expressed reservations about the Company's ability to continue as a going concern, Sherb issued an unqualified opinion.

34.     Sherb, by virtue of its role as SOL's outside auditor, had full, complete, and intimate knowledge of Smart Online's financial reporting practices based on access to confidential internal corporate, financial, operating, and business information.

35.     Sherb violated GAAP and SEC Rules by: (i) failing to disclose "any fraud, whether or not material;" (ii) failing to disclose the true financial condition of Smart Online; and, (iii) failing to establish and maintain adequate internal accounting controls to detect the fraudulent scheme.  Sherb knew or disregarded, or was severely reckless in not knowing or disregarding, the sham entries for consulting or investor relation fees, which masked the bribes paid to brokers.  Sherb also knew or disregarded, or was severely reckless in not knowing or disregarding, the fact that the Company was under a cloud of suspicion because of the SEC suspension and NASDAQ disqualification.  By failing to discover through the exercise of reasonable care and/or reveal or otherwise fully disclose the material information about Smart Online discussed above and by, instead, issuing an unqualified opinion, Sherb contributed, continued, and advanced the RICO conspiracy.

13

36.    In conducting an audit, an auditor must obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  AU § 326.01.  During the course of Sherb's audits of Smart Online, there appeared "red flags" which should have raised questions in the auditors' minds and led them to procure additional evidential matter.  Sherb was engaged during the time period when the Company was under a cloud of suspicion in light of the SEC suspension and NASDAQ listing disqualification.  This fact alone should have led Sherb to more closely scrutinize the Company, its officers and directors, the Company's internal and financial controls and reporting, and required additional evidential matter to properly support their unqualified opinion.  Rather than do so, even when the Company's prior auditor, BDO, expressed concerns about the Company, Sherb issued an unqualified opinion.

37.    Management's lack of integrity should, in all instances noted above, have caused Sherb to re-evaluate its risk assessments.  GAAS requires that risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors.  *See* AU §§ 316.12, 316.14.  The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present."  AU § 316.25.  Auditors must exercise due professional care in performing the audit and preparing the audit report.  AU § 230.01.  Due professional care concerns what the auditor does and how well he does it.  AU § 230.04.  Sherb did not exercise due professional care because it failed to obtain sufficient competent evidential matter to support the assertions in the financial statements and

render an accurate audit report on behalf of Smart Online. One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is a "[k]nown history of securities law violations or claims against the entity or its senior management alleging fraud or violations of securities laws." AU § 316.16. In this regard:

(a) Sherb failed to exercise reasonable care in conducting its services for SOL and thereby failed to discover the wrongful conduct of the Directors/Officers and Broker Defendants, including the fact that the bribes paid to brokers were masked as consulting or investor relation fees for which Sherb failed to properly investigate or test;

(b) Sherb failed to disclose, or was severely reckless in not disclosing, any aspect of the manipulative scheme undertaken by the Smart Online Defendants and Broker Defendants, including the fact that the bribes paid to the Broker Defendants;

(c) Sherb disregarded, or was severely reckless in not considering, the past history of defendants Michael Nouri and Henry Nouri and their previous associations with failed companies, including an Italian government order that neither defendant may serve as an officer or director of any Italian company; and,

(d) Sherb disregarded, or was severely reckless in not considering, the fact that soon after the Company first listed on the OTC BB, the Company noted that it did not meet NASDAQ listing requirements, but only months after, it did meet NASDAQ listing requirements, without questioning or requiring additional

evidential matter as to how the Company achieved such a NASDAQ listing in a compressed time frame.

38.     Sherb violated GAAS Standard of Reporting No. 3 that requires informative disclosures in financial statements to be regarded as reasonably adequate unless otherwise stated in the report.  Sherb knew or disregarded, or was severely reckless in not knowing or disregarding, that Smart Online's disclosures were not reasonably adequate due to the matters alleged above as well as other "red flags" that Sherb should have fully investigated but which Sherb failed to properly investigate.

39.     Sherb violated GAAS General Standard No. 2 that requires that independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.  Sherb's failure to issue no opinion or to issue an adverse opinion in light of the material omissions detailed above reveals Sherb's lack of independence in auditing the books and records of Smart Online.

40.     Sherb violated SAS No. 99 in that it failed to adequately consider the risk that the audit financial statements of Smart Online were free from material misstatement, as noted herein, whether caused by errors or fraud.  Sherb knew or ignored, or was severely reckless in not knowing or ignoring, numerous material risks relevant to financial reporting including events and circumstances that occurred or existed at Smart Online, which adversely affected the Company's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements.

41.     Defendant Sherb violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial, and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.  The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be performed.  AU § 150.02.  In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure:  the control environment, the accounting system, and control procedures.  AU § 319.02.

42.     As a result of its issuance of an unqualified opinion, Sherb utterly failed in its role as an auditor as defined by the SEC.  SEC Accounting Series Release No. 296, Relationships Between Registrants and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting.  An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.  The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital.  Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised.  The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.

17

## COUNT I

**(For Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964)**

43.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

44.     Broker Defendants' conducted and participated in the conduct of a RICO enterprise through a pattern of racketeering activity.  Specifically, the Broker Defendants committed securities fraud by agreeing with other members of the criminal enterprise to accept bribes in return for selling Smart Online stock and by negotiating fraudulent agreements to conceal these bribes.  Furthermore, the RICO enterprise unethically and deceptively took and transported money in amounts exceeding $5,000 in violation of the National Stolen Property Act, 18 U.S.C. § 2314.  Finally, the RICO enterprise used the wires to further the purpose of the RICO enterprise, such that it committed wire fraud in violation of 18 U.S.C. § 1343.

45.     There was an association-in-fact between the Broker Defendants, Directors/Officers of Smart Online, and other unnamed associates, such that a RICO enterprise existed and the association-in-fact exercised control over the enterprise.

46.     The participants were associated by their common purpose.  The purpose shared by the Broker Defendants, Officers/Directors of Smart Online and other associates was to fraudulently increase the volume and price of Smart Online securities.  By artificially increasing the volume and price, Smart Online securities could be listed on NASDAQ and financially benefit the RICO enterprise.

18

47. Initially, the RICO enterprise wanted to increase the daily trading volume from approximately 5,000 shares per day to 30,000 shares per day in an effort to increase overall market capitalization. *See* SEC Complaint at ¶ 19. The RICO enterprise also sought to increase the number of SOI stockholders with the goal of enlisting a minimum of 400 shareholders of record. *Id.* at ¶ 20.

48. There was a relationship between the associates of the RICO enterprise, including the Broker Defendants. The Directors/Officers of Smart Online had a business relationship and contractual relationship with the Broker Defendants, in that the brokers provided investors for the Directors/Officers' stock. The associates communicated and exchanged money, as evidence by the consulting agreements and the phone calls between them.

49. The association-in-fact that formed the RICO enterprise was sufficient in longevity to pursue its purpose of fraudulently increasing market capitalization and the number of shareholders of record of Smart Online securities. Between May 2005 and January 13, 2006, the RICO enterprise operated with the purpose of trying to increase market capitalization, by increasing trading in Smart Online stock.

50. Broker Defendants' participation in the RICO enterprise was related and continuous. The criminal actions taken by the Broker Defendants were related, because they had the same purposes, results, participants, victims, and methods of commission. The Broker Defendants' actions were taken with the purpose of and resulted in the increase of trading volume and price of Smart Online Securities. The participants

remained the same in all criminal activity: Directors/Officers of Smart Online and Broker Defendants.

51.    The Broker Defendants' racketeering activity was continuous.   The Broker Defendants committed securities fraud in association with the Directors/Officers of Smart Online for a substantial period of time.   Moreover, had the SEC not intervened to enjoin further criminal behavior, the Broker Defendants would likely have continued to commit criminal acts.

52.    The conduct taken by the Broker Defendants and Directors/Officers of Smart Online was related and continuous.   The Directors/Officers of Smart Online began bribing brokers as early as May 2005.   The bribes continued, on a regular basis, until the SEC enjoined the bribery in January 2006.

53.    The Broker Defendants conducted a pattern of racketeering activity, by violating federal security law, transporting stolen property, and violating federal wire fraud laws.

54.    The Broker Defendants were variously convicted of violations of the federal securities laws, for wire fraud and commercial fraud, in connection with the RICO enterprise described above.   For the purpose of this complaint, a guilty plea to federal securities fraud charges is considered as a conviction for violating federal securities law.   Defendant Lustig pled guilty to securities fraud on May 22, 2009. Defendant Doolan pled guilty to securities fraud on February 11, 2008.   Serrano pled guilty to securities fraud on May 19, 2009.   Non-defendant RICO co-conspirators Martin

and Michael Nouri were found guilty of securities fraud, among other federal crimes, after a jury trial in the Southern District of New York.

55.     While the Private Securities Litigation Reform Act bars predicate acts under RICO based on "conduct that would have been actionable as securities fraud," there is an exception where the individual is convicted of securities fraud.

56.     In conduct of the RICO enterprise the Broker Defendants transported property, *i.e.* payments from the Officers/Director and from the Broker Defendants' customers for artificially inflated Smart Online securities, worth more than $5000, in interstate commerce.  The Broker Defendants knew the property was taken by fraud, deceit, and other unethical and illegal means.

57.     Associates to the RICO enterprise committed wire fraud, which is a racketeering activity under RICO.  Michael Nouri and Martin were convicted of wire fraud in connection with the securities fraud they perpetrated in concert with the Broker Defendants.  The Broker Defendants also violated wire fraud laws, in furtherance of the RICO enterprise, and in order to inflate Smart Online securities prices and to increase volume of Smart Online securities being trades on a national securities exchange

58.     The Plaintiff, Smart Online, was injured by reason of the Broker Defendants' RICO violations  Broker Defendants' illegal conduct directly harmed Smart Online's reputation with both investors, creditors, customers and vendors, decreased its ability to raise capital, and resulted in significant costs to Smart Online associated with the securities fraud litigations.

59. The Plaintiff is entitled treble damages in an amount to be determined by the jury and to attorneys' fees, because any person injured in his business or property by reason of a violation of [RICO to] . . . [can] recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

## COUNT II

**(For Brokers Defendants Violations of North Carolina General Statute § 75-1.1)**

60. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

61. Broker Defendants' acts and practices described above constituted unfair and/or deceptive trade practices within the meaning of N.C. Gen. Stat. § 75-1.1.

62. Plaintiff has a private right of action against each of the Broker Defendants under N.C. Gen. Stat. § 75-1.1.

63. At all relevant times, Broker Defendants engaged in unfair and/or deceptive business practices in violation of N.C. Gen. Stat. § 75-1.1. The acts alleged in this Complaint, occurred "in or affecting commerce," which is defined as "all business activities," and includes the fiduciary business in which Broker Defendants were and are engaged.

64. As set forth in this Complaint, Broker Defendants engaged in business acts or practices that are unfair; committed business acts or practices that offend established public policy and/or are immoral, unethical, oppressive, unscrupulous, or substantially injurious. Therefore, Broker Defendants have engaged in unfair trade practices prohibited by N.C. Gen. Stat. § 75-1.1 as alleged in this Complaint.

65.     By virtue of Broker Defendants' violations of N.C. Gen. Stat. § 75-1.1, Plaintiff has suffered injury and damages.

66.     Broker Defendants' violations of N.C. Gen. Stat. § 75-1.1 entitles Plaintiff to an award of compensatory damages with interest thereon plus the costs of this action.

67.     Broker Defendants' violations of N.C. Gen. Stat. § 75-1.1 further entitle Plaintiff to treble damages and for reimbursement of Plaintiff's reasonable attorneys fees' and expenses incurred in the prosecution of this action pursuant to N.C. Gen. Stat. § 75-16.

## COUNT III

### (For Sherb's Violation of North Carolina General Statute § 75-1.1)

68.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

69.     Defendant Sherb's acts and practices described above constitute unfair and/or deceptive trade practices within the meaning of N.C. Gen. Stat. § 75-1.1.

70.     Plaintiff has a private right of action against defendant Sherb s under N.C. Gen. Stat. § 75-1.1.

71.     At all relevant times, Defendant Sherb's engaged in unfair and/or deceptive business practices in violation of N.C. Gen. Stat. § 75-1.1. The acts alleged in this Complaint, occurred "in or affecting commerce," which is defined as "all business activities," which includes the fiduciary business in which Defendants were and are engaged.

72.     As set forth in this Complaint, Defendant Sherb engaged in business acts or practices that were, *inter alia*, unfair; offend established public policy and/or were substantially injurious to Plaintiff.   Therefore, Defendant Sherb engaged in unfair trade practices prohibited by N.C. Gen. Stat. § 75-1.1 as alleged in this Complaint.

73.     Moreover, the conduct of Sherb substantially aided, abetted and assisted the misconduct of the Broker Defendants and the Director/Officers in violation of N.C. Gen. Stat. § 75-1.1.

74.     By virtue of Defendant Sherb's violations of N.C. Gen. Stat. § 75-1.1, Plaintiff has suffered injury and damages.

75.     Defendant Sherb's violations of N.C. Gen. Stat. § 75-1.1 entitle Plaintiff to an award of compensatory damages with interest thereon plus the costs of this action.

76.     Defendant Sherb's violations of N.C. Gen. Stat. § 75-1.1 further entitle Plaintiff to treble damages pursuant to, and reimbursement of plaintiffs reasonable attorneys fees and expenses incurred in the prosecution of this action pursuant to N.C. Gen. Stat. § 75-16.

<u>**COUNT IV**</u>

**(For Malpractice Against Defendant Sherb)**

77.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

78.     BDO's "Report of Independent Registered Public Accounting Firm," dated February 28, 2005, stated as follows:  "[T]he Company has suffered recurring losses from

operations and at December 31, 2004 had deficiencies in working capital and equity that raise substantial doubt about its ability to continue as a going concern."

79.     Unlike BDO, defendant Sherb issued an unqualified opinion, although it had no basis to do so. The Consolidated Notes to Financial Statements for the Years Ended December 31, 2004, 2003 and 2002 ("Consolidated Notes"), made a part of Form S-1, recapitulates BDO's warning that "Smart Online may be unable to continue as a going concern." The Consolidated Notes also state:

> Smart Online's continuation as a going concern is dependent upon its ability to generate sufficient cash flows to meet its obligations on a timely basis, to obtain additional financing as may be required and ultimately to attain profitable operations and positive cash flows.

80.     Notably, defendant Sherb's audit opinion never expressed any of the concerns that led BDO to issue tersely-stated qualified opinions.

81.     Defendant Sherb's audit of Plaintiff and issuance of an unqualified opinion was an act of malpractice. Defendant Sherb failed to follow generally accepted standards for accounting and auditing a business. Defendant Sherb failed to have procedures in place designed to provide reasonable assurance of detecting illegal acts, designed to identify related party transaction that are material to the financial statements and evaluate whether there is substantial doubt about the ability of the issuer to continue as a going concern during the fiscal year.

82.     Defendant Sherb failed to comply with the provisions of Section 10A of the Exchange Act by failing to determine whether it was likely the Company had engaged in an illegal act, determine the effect of the illegal act on the Company's financial

statements, and take proper remedial action by informing appropriate management and ensuring that the Audit Committee was informed about the illegal act.

83.     Defendant Sherb failed to disclose or was severely reckless in not knowing or disregarding the illegal acts and the manipulation scheme in place and/or ignoring clear and present evidence that the Smart Online Directors/Officers were engaged in an illegal enterprise to manipulate the price of Smart Online stock through bribes.

84.     Defendant Sherb failed to disclose or was severely reckless in not knowing or disregarding that the Company's disclosures were not adequate and that Smart Online had no meaningful internal financial accounting and reporting controls or mechanisms in place necessary to provide adequate assurance to satisfy the financial accounting and reporting requirements of GAAP, GAAS and/or SOX.

85.     As a result of issuing of the unqualified opinion, Defendant Sherb committed malpractice.

86.     By virtue of defendants' wanton conduct, the underlying economic value of the securities traded was distorted.  When the truth of the securities' value was finally and fully revealed, the price of Plaintiff's stock drastically declined and Plaintiff was damaged thereby.

## COUNT V

### (For Breach of Contract by Sherb)

87.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

88.     Defendant Sherb made representations and promises to Plaintiff, in

exchange for monetary consideration, it would provide an independent audit of the audit performed by Smart Online Audit Committee and that it would perform it accounting services for Smart Online through the exercise of independent and competent professional standards.

89.     This constituted a binding agreement between Plaintiff and the Auditor Defendant.

90.     By failing to have adequate procedures in place to perform an accurate audit, by failing to recognize that Smart Online was severely deficient in its internal controls, and by failing to investigate properly red flags that would have led to discovery of the bribery scheme to illegally and artificially inflate Smart Online shares, Defendant Sherb failed to perform an independent audit pursuant to generally accepted accounting principles and otherwise failed to exercise proper professional conduct in connection with its service provided to Smart Online.

91.      As a result, defendant Sherb breached its contract with Plaintiff.

92.     As a result, Plaintiff is entitled to the benefit of its bargain, and the defendant Sherb is liable to Plaintiff for the loss that could have been avoided by Smart Online, had there been a proper, professionally conducted independent audit.

## COUNT VI

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

93.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

94.     North Carolina law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of North Carolina.

95.     As a result of the actions of the defendant Sherb, in purportedly performing an audit and issuing an unqualified opinion, breached the above described contract for reasons that are a breach of the covenant of good faith and fair dealing.

96.     As a proximate and foreseeable result, the Plaintiff suffered damages.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     On Counts I, II and III, awarding Plaintiff compensatory damages, trebled, against defendants, for the damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.     On Count IV, awarding Plaintiff compensatory damages, against defendant Sherb, for the damages sustained as a result of defendant Sherb's malpractice, in an amount to be proven at trial, including interest thereon, and exeplarary and punitive damages to the extent defendant Sherb's conduct is established by the triaer of fact to be reckless and/or intentional;

C.     On Count V and VI, awarding Plaintiff compensatory damages, against defendant Sherb, for the damages sustained as a result of defendant Sherb's breach of its contract with Plaintiff and breach of the implied covenant of good faith and fair dealing;

D.     Awarding Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees and experts' fees; and

E.     Such other and further relief as the Court may deem just and proper.

28

# JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: March 26, 2010.

Respectfully submitted,

/s/ S. Ranchor Harris, III
S. Ranchor Harris, III (Bar # 21022)
Connors Morgan Sinozich
609 B Eugene Court
Greensboro, NC 27401
rharris@connorslegal.com
336-333-7907

*Local Counsel for the Plaintiff*

**BROWER PIVEN**
**A Professional Corporation**
David A.P. Brower
488 Madison Avenue, 8th Floor
New York, New York  10022
Tel: 212-501-9000
Fax: 212-501-0300

**KAHN SWICK & FOTI, LLC**
Lewis S. Kahn
650 Poydras Street, Suite 2150
New Orleans, Louisiana  70130
Tel: 504-455-1400
Fax: 504-455-1498

*Counsel for Plaintiff*